Thomas B. CHARPENTIER,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 86–210.

Supreme Court of Wyoming.

May 4, 1987.

Public Defender Program, Leonard Munker, State Public Defender, and Martin J. McClain, Deputy State Public Defender, and Wyoming Defender Aid Program, Gerald M. Gallivan, Director, Laramie, and William A. Kurlander, Student Intern, for appellant.

A.G. McClintock, Atty. Gen., John W. Renneisen, Sr. Asst. Atty. Gen., and Karen A. Byrne, Asst. Atty. Gen., for appellee.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

MACY, Justice.

Appellant Thomas B. Charpentier was found guilty by a jury of forgery in violation of § 6–3–602(a)(i) and (iii), W.S.1977. The district court fined appellant $500 and sentenced him to one and one-half to three years in the Wyoming State Penitentiary.

Appellant contends on appeal to this Court that, because he was not represented by counsel at the preindictment lineup, his conviction should be reversed. Although cognizant of the rule that the right to representation by counsel attaches only when adversarial judicial criminal proceedings have commenced, appellant urges us to find that the right attaches at a preindictment line-up.

We decline to extend the right to representation by counsel guaranteed by the Sixth Amendment to the United States Constitution and Art. 1, § 10 of the Wyoming Constitution to the preindictment lineup stage of the criminal proceedings, and consequently we affirm.

On January 17, 1986, at approximately nine in the morning, two men approached a teller window at Norwest Bank in Gillette, Wyoming. One of the men endorsed a check with the name Tom Charpentier and placed a driver's license belonging to Tom Charpentier on the counter. The signature endorsed on the back of the check matched the signature on the driver's license. On the front of the check, the name of the original payee was marked out and the name Tom Charpentier was written in its place. The teller cashed the check, paying the man primarily with $50 and $20 bills.

Approximately a half an hour later, the teller learned that the check had been reported stolen earlier that morning and that a stop payment order had been placed on it. The bank contacted the Campbell County sheriff's office, and shortly thereafter Deputy John Bruner arrived to investigate. He obtained a description from the teller of the man who cashed the check and an address for Tom Charpentier. Finding no one at home at the address, the deputy spoke to the landlord and was told that Charpentier had paid his rent that day with $50 bills. As he was leaving, Deputy Bruner saw appellant, whose appearance matched the description provided by the bank teller, coming out of the apartment. Deputy Bruner approached appellant and, following a brief discussion, arrested him for forgery.

At the sheriff's office later that afternoon, appellant was placed in a lineup with four other men. The bank teller then was

asked if the man for whom she had cashed the check that morning was among the five men. She identified appellant. Later that evening, Deputy Bruner filed a criminal complaint charging appellant with forgery and fraud.

Prior to trial, appellant filed a motion to suppress the evidence of identification on the ground that the lineup violated his constitutional right to representation by counsel. Citing *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), the district court denied the motion on the ground that appellant's right to counsel had not attached at the time he was placed in the lineup and identified by the State's witness.

In *Kirby*, the United States Supreme Court was asked to decide whether the Sixth Amendment right to counsel attached when the defendant was identified by the victim prior to indictment but after arrest. The Supreme Court stated:

"[I]t has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him * * * whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.

\* \* \* \* \* \*

"* * * 'The rationale of [that rule is] that an accused is entitled to counsel at any "critical stage of the *prosecution*," * * *.' * * * We decline to depart from that rationale today by imposing a per se exclusionary rule upon testimony concerning an identification that took place long before the commencement of any prosecution whatever." *Id.*, at 406 U.S. 688–90, 92 S.Ct. at 1881–83 (emphasis in original).

Since *Kirby*, the Wyoming Supreme Court has been confronted with a number of cases involving the question of when the right to counsel attaches. *State v. Heiner*, Wyo., 683 P.2d 629 (1984); *Brown v. State*, Wyo., 661 P.2d 1024 (1983); *Auclair v. State*, Wyo., 660 P.2d 1156, cert. denied 464 U.S. 909, 104 S.Ct. 265, 78 L.Ed.2d 249 (1983). In each case, we applied the rule

and rationale set forth by the United States Supreme Court in *Kirby*. Most recently in *State v. Heiner*, 683 P.2d at 637, we said:

"It is clear that in this jurisdiction a Sixth Amendment right to counsel attaches only when adversarial criminal proceedings have been commenced against an accused. It follows that * * * *evidence obtained * * * prior to the filing of the criminal complaint [was] not obtained in violation of [the defendant's] Sixth Amendment right to counsel.*" (Emphasis added and citation omitted.)

Appellant having failed to demonstrate any compelling reason why this Court should depart from the established rule, we hold that he was not entitled to counsel at the preindictment lineup.

Affirmed.

URBIGKIT, J., filed a dissenting opinion.

URBIGKIT, Justice, dissenting.

Explicit in the Wyoming Constitution, the bedrock of a fair and properly applied system of criminal justice requires a defendant be adequately represented by competent counsel, with guilt or innocence to be determined by a fair and impartial fact finder, normally the constitutionally provided jury. Article 1, § 6, Due process of law; Art. 1, § 9, Trial by a jury inviolate; and Art. 1, § 10, Right of accused to defend. See Abrahamson, *Criminal Law and State Constitutions: The Emergence of State Constitutional Law*, 63 Texas L.Rev. 1141 (1985). Availability of adequate legal representation is clearly constrained when the participation of defense counsel is limited to the extent that the attorney can become involved in the criminal charge and trial process.

The exigent-circumstance rule of the Alaska and California courts involving post-arrest lineups when counsel has been requested, more adequately accommodates my perception of constitutional due process and fairness.

"Although extending the right to counsel to preindictment lineups will thus impose

an additional burden upon the police, and may delay the staging of the lineup, these consequences do not appear substantial enough to justify denying defendant this protective right. The burden of securing counsel is exactly the same as that which police departments must assume if they wish to question a defendant who invokes his right to counsel under *Miranda v. Arizona,* supra, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 [(1966)] it is a requirement which governed all California lineups during the five years between Wade and Kirby —without, so far as we are aware, significantly impeding police investigation. The delay involved in securing counsel will generally be a matter of hours at most. If conditions require immediate identification without even minimal delay, or if counsel cannot be present within a reasonable time, such exigent circumstances will justify proceeding without counsel." *People v. Bustamante,* 30 Cal.3d 88, 177 Cal.Rptr. 576, 584, 634 P.2d 927, 935 (1981).

I agree that the Wyoming court, as the Alaskan court, may and in some circumstances should, assure broader safeguards than the minimum federal standards. See my dissent in *State v. Brunmeier,* Wyo., 733 P.2d 265 (1987). I would follow the thoughtful perspective of the Alaska court:

> " 'In evaluating evidence used at trial from a lineup without counsel, we are not merely concerned with the fundamental fairness of that lineup. We are also concerned with the need for counsel to be present in order to evaluate the circumstances and prepare his argument at trial sufficiently to provide the defendant with his sixth amendment right to confront identifying witnesses.' [Quoting from *Davis v. State,* Alaska, 499 P.2d 1025, 1032 (1972).] "In balancing the need for prompt investigation against a suspect's right to fair procedures, we hold that a suspect who is in custody is entitled to have counsel present at a pre-indictment lineup unless exigent circumstances exist so that providing counsel would unduly interfere with a prompt and purposeful investiga-

tion." *Blue v. State,* Alaska, 558 P.2d 636, 641–642 (1977).

From the standpoint of logic as well as participative valuation of the doer and the "doee," no differentiation is discernible in the adversarial criminal proceedings between time of arrest until time of arraignment as differentiated from the time and events occurring post-arraignment. Thoughtfully persuasive is the Michigan Supreme Court's analysis of *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), expressed in *People v. Anderson,* 389 Mich. 155, 205 N.W.2d 461 (1973), and later followed in *People v. Jackson,* 391 Mich. 323, 217 N.W.2d 22 (1974).

> " * * * In a *plurality opinion* the *per se* exclusionary rule was held not to apply to testimony concerning *'pre-indictment' out-of-court corporeal identification procedures.* Since there is no agreement by a majority of the United States Supreme Court regarding the limitation of right to counsel in Kirby, we are not permitted to follow Kirby as authoritative precedent on the question of counsel. The clear rule in Michigan is that a majority of the Court must agree on a ground for decision in order to make that binding precedent for future cases. If there is merely a majority for a particular result, then the parties to the case are bound by the judgment but the case is not authority beyond the immediate parties. * * *

> \* \* \* \* \* \*

> " * * * Constitutional rules of construction do not permit us to read Kirby as abrogating the pre-indictment requirements for counsel and the other rules of Wade, Gilbert, Stovall and Simmons, by all of which we are still bound." *People v. Anderson,* supra, 205 N.W.2d at 467–468.

See also the critique of *Kirby v. Illinois,* supra, in the dissenting opinion in *People v. Hawkins,* 55 N.Y.2d 474, 450 N.Y.S.2d 159, 166, 435 N.E.2d 376, 383, reargument denied 56 N.Y.2d 1032, 453 N.Y.S.2d 1028, 439 N.E.2d 402, cert. denied 459 U.S. 846, 103 S.Ct. 103, 74 L.Ed.2d 93 (1982).

This subject of lineup identification, right to counsel, and the illogic of *Kirby v. Illinois,* supra is not without commentator review: Grano, *Kirby, Biggers and Ash: Do Any Constitutional Safeguards Remain Against the Danger of Convicting the Innocent?*, 72 Mich.L.Rev. 717, 730 (1974); Young, *Supreme Court Report,* 58 A.B.A.J. 1092 (1972); Note, *Criminal Law—The Lineup's Lament, Kirby v. Illinois,* 22 De Paul L.Rev. 660, 675 (1973); Note, *Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification,* 29 Stan.L.Rev. 969, 996 (1977); Comment, *Right To Counsel At Police Identification Proceedings: A Problem in Effective Implementation of An Expanding Constitution,* 29 U.Pitt.L.Rev. 65, 78, n. 81 (1967); Quinn, *In the Wake of Wade: The Dimensions of Eyewitness Identification Cases,* 42 U.Colo.L.Rev. 135, 143 (1970); Note, *The Pretrial Right to Counsel,* 26 Stan.L.Rev. 399, 410 (1974); Note, 1975 Wash.U.L.Q. 423, 437–440; Polsky, Uviller, Ziccardi, and Davis, *The Role of the Defense Lawyer at a Lineup in Light of the Wade, Gilbert, and Stovall Decisions,* 4 Crim.L. Bulletin 273 (1968); Read, *Lawyers at Lineups: Constitutional Necessity or Avoidable Extravagance?*, 17 U.C.L.A.L. Rev. 339 (1969); Note, *Due Process Considerations in Police Showup Practices,* 44 N.Y.U.L.Rev. 377 (1969); Note, *Pretrial Identification Procedures-Wade to Gilbert to Stovall: Lower Courts Bobble the Ball,* 55 Minn.L.Rev. 779 (1971); Comment, *Kirby v. Illinois: A New Approach to the Right to Counsel,* 58 Iowa L.Rev. 404 (1972); Comment, *Right to Counsel at Lineup,* 11 Duq.L.Rev. 405 (1973); Comment, *Preindictment Identification Confrontation Held Not To Be Critical Stage Of The Prosecution Where The Accused's Right To Counsel Attaches,* 4 Loy.U.Chi. L.J. 213 (1973); Note, *Is Missouri Ready to Extend the Right to Counsel to Pre-Indictment Lineups?*, 46 U.Mo.K.C.L.Rev. 148 (1977); Pulaski, *Neil v. Biggers: The Supreme Court Dismantles the Wade Trilogy's Due Process Protection,* 26 Stan. L.Rev. 1097 (1974); Note, *Counsel Required at Lineup Only if Formal Judicial Proceedings Have Been Initiated,* 47 Tul. L.Rev. 899 (1973); Note, *Showdown Over the California Showup,* 11 Hastings Const.L.Q. 135 (1983); Grano, *Prophylactic Rules in Criminal Procedure: A Question of Article III Legitimacy,* 80 Nw.U.L.Rev. 100, 120 (1985). See law journals articles cited in *People v. Hawkins,* supra, n. 14.

As Justice Brennan so aptly observed in *United States v. Wade,* 388 U.S. 218, 228–229, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967):

"\* \* \* A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification. A commentator has observed that '[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor—perhaps it is responsible for more such errors than all other factors combined.' Wall, Eye-Witness Identification in Criminal Cases 26."

The law in Pennsylvania is also in accord. *Commonwealth v. Richman,* 458 Pa. 167, 320 A.2d 351 (1974); *Commonwealth v. Taylor,* 472 Pa. 1, 370 A.2d 1197 (1977); *Commonwealth v. Smith,* 260 Pa.Super. 38, 393 A.2d 1001 (1978).

"In all criminal prosecutions the accused shall have the right to defend in person and by counsel \* \* \*." Article 1, § 10, Wyoming Constitution.

The fiction adopted in the recent United States Supreme Court opinions aside, a criminal prosecution is comprehensively commenced when the individual is arrested and hauled off to the local confinement facility. The accusatory stage and its intrinsic jeopardy has then commenced. *People v. Hutton,* 21 Mich.App. 312, 175 N.W.2d 860 (1970).

An equally persuasive rationale exists for counseled lineups, whether pre- or post-arraignment. Adequacy of representation is delineated by the parameters of applied training and knowledge of defense counsel.

If defense counsel is limited to the defendant's perception of the lineup and the authorities' assurance that the lineup was fair, then, as a matter of course, he must assume an antagonistic posture with regard to the procedural sufficiency of the lineup. Certainly the accused himself may not have had the physical capacity to know whether a lighted neon sign was used to assist in identification. More often than not, trials result from lack of reliable knowledge. The lineup can serve not only to assure the police and prepare the witness but also to educate defense counsel. As we should remember, the tainted pretrial identification may attenuate trial identification. *Trull v. State*, Tex.App., 721 S.W.2d 378 (1986).

Circumstantially, this case does not present the exigent circumstances justifying the lineup before counsel could have been available. The trained eyewitness, as at trial much later, could have been called for the conducted lineup after the accused was provided an attorney as requested. Considering the cases from Campbell County, the personnel in the public defender's staff are demonstratively available. The accusatory stage had clearly been reached when the lineup was held. Annot., 5 A.L. R.3d 1269, 1309.

Without the attendant dubiety of trial uncertainty and appellate validity engendered in this case by the uncounseled lineup, it would not be unreasonable to conclude that if counsel had been present at that lineup neither the trial nor appeal would have followed. This was no photograph arraignment where the defendant need not be present, but instead was a live lineup that could not later be accurately reproduced after identification was achieved. See *United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973). See also *People v. Dumas*, 102 Mich.App. 196, 301 N.W.2d 849 (1980).

In application of the entire process where jeopardy exists after arrest has occurred, I would apply Justice Sutherland's evaluation in *Powell v. Alabama*, 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed.2d 158, 84 A.L.R. 527 (1932):

" * * * Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence."

In *United States v. Wade*, supra, Justice Brennan commented:

" * * * The trial which might determine the accused's fate may well not be that in the courtroom but that at the pretrial confrontation, with the State aligned against the accused, the witness the sole jury, and the accused unprotected against the overreaching, intentional or unintentional, and with little or no effective appeal from the judgment there rendered by the witness—'that's the man.' " 388 U.S. at 235–236, 87 S.Ct. at 1937.

Judge Wilkey, dissenting in the Circuit Court consideration of *United States v. Ash*, supra, knowledgeably analyzed:

" [A] little drama, stretching over an appreciable span of time. The accused is there in the flesh, three-dimensional and always full-length. Further, he isn't merely there, he acts. He walks on stage, he blinks in the glare of lights, he turns and twists, often muttering asides to those sharing the spotlight. He can be required to utter significant words, to turn a profile or back, to walk back and forth, to doff one costume and don another. All the while the potentially identifying witness is watching, a prosecuting attorney and a police detective at his elbow, ready to record the witness' every word and reaction.' [*U.S. v. Ash*,] 149

U.S.App.D.C. 1, 17, 461 F.2d 92, 108 [(1972)]." 413 U.S. at 323, 93 S.Ct. at 2580.

In constitutional foresight, a rational balancing of the rights of society and the accused, efficient operation of prosecutorial function, and minimized conjectural trials and appeals, our forefathers were wise to reiterate the right to counsel held by those criminally accused in this state. It is this case's derogation of that wisdom from which my dissent is generated.

The responsibility of this court as the guardian of the Wyoming Constitution should not be displaced by temporal permutations of the United States Supreme Court in application of the nation's Constitution. It should be remembered that at the Wyoming Constitutional Convention, during those hot unairconditioned days of September, 1889, that the principle of an independent Supreme Court, one of the most heavily debated issues of the convention, was only emplaced by a vote of 21 to 17. Paramount in the debate were the comments of D.A. Preston:

"  *  *  * It is true that the governor of the state and the other officials of the state are of some importance to the state, but the machinery of the state is in the supreme court, and unless the machinery of the state and the policy of the state is such as will administer justice to all alike, then I say to you, gentlemen of the convention, as Mr. Riner has said, let us adjourn and go home." Journals and Debates of the Constitutional Convention (1889) at 523.

George C. Smith amplified:

"  *  *  * But the main reason that we ask for statehood is because we want a government in which the laws can be administered in a way so that we can get justice, and I say now, and I say it without any doubt about what I am saying at all, if you go before the people with this mongrel form of court, they will vote down the constitution, and you cannot blame them." Id. at 532.

The president of the convention, Melville C. Brown, challenged the future of the state:

"  *  *  * [I]f there is any danger for the constitution you propose giving them, the danger lies in adopting a mongrel court, not from adopting an independent supreme court as a part of the constitution. Some gentlemen say we want a state government whether we have a supreme court or not, others say we never want a state government if a supreme court is denied to us. It does not matter how we may view this question, we wish the people to say, and I am willing to trust this matter to the people of Wyoming. Ever since the days of the Magna Charta and the time when the Anglo-Saxon people resisted the government, justice has been the ruling trait of the English speaking people from that day down to the present, and when you say that you will place your form of government above this question of justice, you are refuting the tradition of the race, and turning backward to the days of barbarism." Id. at 531.

And so Wyoming received its Bill of Rights in Art. 1 to be enforced and effectuated by Art. 5, §§ 2 and 3 of that Constitution:

"§ 2. The supreme court shall have general appellate jurisdiction, co-extensive with the state, in both civil and criminal causes, and shall have a general superintending control over all inferior courts, under such rules and regulations as may be prescribed by law.

"§ 3. The supreme court shall have original jurisdiction in quo warranto and mandamus as to all state officers, and in habeas corpus. The supreme court shall also have power to issue writs of mandamus, review, prohibition, habeas corpus, certiorari, and other writs necessary and proper to the complete exercise of its appellate and revisory jurisdiction."

In recognizing the independence and the responsibility of this court, we, the trial bench, and the membership of the Bar of our state should be called to properly consider the literate and persuasive comments of the Vermont Supreme Court:

"This generation of * * * lawyers has an unparalleled opportunity to aid in the formulation of a state constitutional ju-

risprudence that will protect the rights and liberties of our people, however the philosophy of the United States Supreme Court may ebb and flow.

\* \* \* . \* \* \*

"We have an opportunity to develop a sound jurisprudence of state constitutional law that will serve not only this generation * * * but those who will come after us in the decades yet to be." *State v. Jewett,* 146 Vt. 221, 500 A.2d 233, 235–238 (1985).

Because appellant requested but was denied counsel for the lineup contrary to the spirit and text of the Wyoming Constitution, I would reverse and remand for trial based on otherwise available evidence, excluding the improper lineup. I would not find the convoluted discussion nor the facts of *State v. Heiner,* Wyo., 683 P.2d 629 (1984), involving a private investigation, to be authoritative or persuasive,[1] and would follow the enlightened posture once adopted and briefly continued by the United States Supreme Court in *United States v. Wade,* supra, as well as the other trilogy cases. *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), and *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). See also *State v. Earl,* Utah, 716 P.2d 803 (1986); Brennan, *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights,* 61 N.Y.Univ.L.Rev. 535 (1986); and Comment, *Independent Interpretation of the Utah Constitution,* 1987 Utah L.Rev. 79, 82.

It is in that constitutional responsibility that I respectfully dissent.

---

1. Likewise unpersuasive to me is *Brown v. State,* Wyo., 661 P.2d 1024 (1983), where the defendant was not under arrest and "was free to leave" as detailed in the court's opinion. Charpentier was under arrest, had been given a Miranda warning, and faced certain prosecution.